UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DONTEY M. WATKINS and RACHEL WATKINS, husband and wife, and on behalf of minors: L.W., T.W., and G.W.,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF OLYMPIA, BROOKLYN MCKOON, B. HOUSER, A WATKINS, J. WINNER, and RICH ALLEN,<br><br>Defendants. | CASE NO. 3:22-cv-5554<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## 1. INTRODUCTION

This is a Section 1983 case: Plaintiff Dontey Watkins and his family allege Defendant City of Olympia, through its police department and officers, violated his civil rights when they arrested him without probable cause. The City now moves for summary dismissal, arguing that no reasonable juror could find that probable cause was lacking. The Court agrees and thus GRANTS Defendants' motion for summary judgment.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 1

## 2. BACKGROUND

Rachel and Dontey Watkins are married (together, "Plaintiffs") and live together in Thurston County, Washington.[1] Dkt. No. 1 at 2. On October 23, 2020, Rachel petitioned the Thurston County Superior Court ("Superior Court") for a civil domestic violence protection order against Dontey. Dkt. No. 21 at 5. In the petition, Rachel claimed under penalty of perjury that Dontey "has a history of drug/Alcohol abuse. [And] [h]as become physically violent and has made threats in the past to [Rachel] if [she] attempts to leave." *Id.* at 8. Rachel described Dontey's most recent act of domestic violence as follows: "[Dontey] was projecting hostile behavior. I had to contact police to try and get him help. [Dontey] text[ed] [me] while in the home that there were shadows and demons." *Id.* at 9.

Based on Rachel's petition, a Superior Court Commissioner found that "an emergency exists and that a Temporary Protection Order should be issued without notice to [Dontey] to avoid irreparable harm." *Id.* at 32. The Superior Court issued a Temporary Protection Order against Dontey restraining him from taking these actions against Rachel and their children: (1) causing them "physical harm"; (2) harassing or cyberstalking them; (3) coming near or in contact with them, whether in person or through other means, such as phone or mail; (4) going onto the grounds of or entering Rachel's residence, workplace, or the kids' school; and (5) knowingly coming within or remaining within 1,000 feet of Rachel and their children or their residence, workplace, or daycare. *Id.* at 32-33. The order included other restraints,

---

[1] To avoid confusion, the Court refers to the Watkinses by their first names. No disrespect is intended.

such as granting Rachel "exclusive" right to the couple's home and granting her "use" of the couple's minivan. *Id.* The Superior Court set a hearing on the matter for November 6, 2020. *Id.* at 32.

On November 4, 2020, Rachel returned to the Superior Court to modify the court's Temporary Restraining Order. *Id.* at 39. She petitioned the Superior Court to lift the "no-contact" provisions to allow Dontey to spend time with his children in their home and to allow Dontey to watch their children on weekends while Rachel worked. *Id.* at 39-40. The Superior Court granted Rachel's request and issued a modified order as follows:

> All protections from contact with the minor children are lifted. All restraints listed in paragraphs 3, 4, and 6 are terminated. [Rachel] is still granted temporary custody of the minor children. [Dontey] may visit with the minors but only if [Rachel] agrees.

Dkt. No. 22-6 at 3. Most relevant here, the Superior Court ordered that all other terms of the original Temporary Restraining Order would remain in effect. *Id.*

On November 5, 2020, a law enforcement officer served Dontey copies of various documents, including the original Temporary Restraining Order and the modified order. Dkt. No. 21 at 42. Around this same time, Dontey began sending Rachel long, rambling text messages. Rachel only responded a few times. In more than one message she expressed her love for Dontey, telling him that he was experiencing a mental health crisis, and offering to help him find a crisis center. Dkt. Nos. 21-3 at 10-11; 21-4 at 7; 21-6 at 1. In other messages, she accused him of engaging in "manipulation techniques" and always finding ways to be "abusive." Dkt. Nos. 21-1 at 2; 21-2 at 8. She texted him that he had gone "too far," that she

was "done" with him, to stop texting, not to contact her anymore, that continued text would be violating the protection order, and that if he "c[a]me around [their marital home] you will go to jail instead." Dkt. Nos. 21-2 at 8; 21-5 at 18, 21;21-6 at 1, 4-6.

On November 6, 2020, the Superior Court held a hearing to determine whether the protection order should be extended for a year. Dkt. No. 21 at 32, 34. Rachel attended the hearing, but Dontey failed to appear. The Superior Court continued the hearing to a later date, but not before "terminat[ing]" the previous modifications and reinstating the terms of the original Temporary Restraining Order against Dontey. *Id.* at 44.

On November 7, 2020, Dontey went to the couple's home. Dkt. No. 24 at 1. Rachel called 911 and told the dispatcher that Dontey tried to get inside, that she needed to serve him with the latest iteration of the protection order, that he took their minivan without permission, and that she "wants him to get mental health help, not go to jail." Dkt. No. 21 at 48. Defendant Brooklyn McKoon, an Olympia Police Department officer, responded to the call. *Id.* Rachel showed McKoon the text messages Dontey had sent her, and Rachel handwrote a statement under penalty of perjury describing the incident. *Id.* at 87. In her statement, Rachel wrote that Dontey continued to send her "manipulative," "threatening," and "slander[ous]" text messages, and that despite her requests for him to stop, he continued anyway. She also wrote that Dontey had threatened to expose a "sex tape" of her to her family. *Id.* Lastly, Rachel wrote that Dontey accessed their home and took their minivan

without her permission. *Id.* In addition, a neighbor completed a sworn police statement describing Dontey driving away in the family minivan. Dkt. No. 21 at 90.

The day after, on November 8, McKoon arrested Dontey for violating the Temporary Protection Order that he was served with on November 5, 2020. *Id.* at 60-62.

The Olympia City Attorney's Office charged Dontey with Violation of a No Contact or Protection Order in Olympia Municipal Court ("Municipal Court"). Dkt. No. 1 at 7. He spent six days in jail before posting bond. Dkt. No. 1 at 8. The Municipal Court found Dontey to be indigent and appointed him a public defender. *Id.* Dontey eventually obtained private counsel. Dkt. No. 1 at 12. About six months after he was charged, the City Attorney's dropped its case against Dontey. *Id.*

### 3.  DISCUSSION

**3.1  Legal standard.**

**3.1.1  Summary Judgement.**

"[S]ummary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Frlekin v. Apple, Inc.*, 979 F.3d 639, 643 (9th Cir. 2020) (internal citation omitted). A dispute is *genuine* if "a reasonable jury could return a verdict for the nonmoving party," and a fact is *material* if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, courts must view the evidence "'in the light most favorable to the non-moving party.'" *Barnes v. Chase Home Fin., LLC*,

934 F.3d 901, 906 (9th Cir. 2019) (internal citation omitted). "[S]ummary judgment should be granted where the nonmoving party fails to offer evidence from which a reasonable jury could return a verdict in its favor." *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Summary judgment should also be granted where there is a "complete failure of proof concerning an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

### 3.1.2 Section 1983, generally.

"Section 1983 creates a 'species of tort liability' for 'the deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 362 (2017) (internal citations omitted). To prevail on a Section 1983 claim, the plaintiff must prove two essential elements: (1) "that a right secured by the Constitution or laws of the United States was violated," and (2) "that the alleged violation was committed by a person acting under the color of State law." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). The plaintiff must also show that "the defendant's conduct was the actionable cause of the claimed injury," meaning both the cause-in-fact and proximate cause. *Spencer v. Peters*, 857 F.3d 789, 800 (9th Cir. 2017).

In addition, to hold a municipality liable, the plaintiff must show that "action pursuant to official municipal policy" caused the constitutional tort. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

### 3.2 Plaintiffs' *Monell* claims against the City are dismissed.

#### 3.2.1 Plaintiffs do not establish a triable question of fact on their failure to train claim because they fail to show that the City acted with deliberate indifference.

Plaintiffs claim the City inadequately trained the police officers who arrested Dontey: Defendants McKoon, A. Watkins, and J. Winner. Specifically, Plaintiffs allege that all three officers lacked sufficient training about arresting individuals suspected of violating no-contact or protection orders. To support this claim, Plaintiffs argue the Police Department's Policy Manual was deficient and that the Department did not "set [an] expectation for how often [officers] are to review the policies." Dkt. No. 25 at 18.

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To give rise to liability, a municipality's failure to train "must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "'Deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Id.* (citation omitted).

The Supreme Court has cautioned that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on failure to train," *id.*, "[b]ut it may happen that in light of the duties assigned to specific [police] officers … the need for more or different training is so obvious, and the inadequacy

so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Harris,* 489 U.S. at 390. A "pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014).

Plaintiffs identify no pattern of similar constitutional violations or knowledge on the City's part that its training program was inadequate before Dontey's arrest. Nor do they make the case that this is one of those "narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63 (internal citation omitted). And the mere fact that multiple police officers participated in Dontey's arrest does not demonstrate a pattern of similar violations. *Dillman v. Tuolumne Cnty.*, No. 1:13-CV-00404 LJO, 2013 WL 3832736, at *5 (E.D. Cal. July 23, 2013).

Instead, Plaintiffs argue that the Department's personnel should have reviewed its policies more regularly and that shorter intervals between trainings are preferable. But arguing that "better or more training" would have avoided the constitutional injury will not establish municipal liability for failure to train because "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Harris,* 489 U.S. at 388-91 (proof of inadequate training "does not render the city liable [under § 1983] per se").

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 8

Without the City's knowledge that its training program was constitutionally inadequate—and disregard for the known and obvious consequences of this fact—Plaintiffs cannot establish a *Monell* claim for failure to train.

### 3.2.2   Deprivation of right to counsel claim.

Plaintiffs also contend the City deprived Dontey of his Sixth Amendment right to counsel by appointing him an ineffective attorney. Defendants move for summary judgment, arguing the City cannot be held liable for the alleged deficiencies of Dontey's public defender because Plaintiffs have not established any constitutionally deficient policies or customs regarding appointed counsel. In their opposition brief, Plaintiffs fail to respond to Defendants' attacks. Even so, the Court will not grant the motion on this basis without considering whether genuine issues of material fact exist. *See Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).

After reviewing the record, the Court finds that no genuine issues of material fact preclude summary judgment on this claim. In their complaint, Plaintiffs allege the City "failed to assign [Dontey] an attorney that would exercise basic diligence," which deprived him of a "reasonable" and "meaningful" opportunity to present his defense. Dkt. No. 1 at 18. But as explained above, to hold the City liable, "plaintiffs suing a municipal entity for damages under 42 U.S.C. § 1983 'must show that their injury was caused by a municipal policy or custom.'" *Sabra v. Maricopa Cnty. Cmty. Coll. Dist.*, 44 F.4th 867, 883 (9th Cir. 2022) (citing *L.A. Cnty. v. Humphries*, 562 U.S. 29, 30-31 (2010)). Plaintiffs offer no evidence of an official City policy or custom

of depriving criminal defendants the right to counsel by appointing public defenders who lack "basic diligence."

The Court thus GRANTS Defendants' motion for summary judgment on Plaintiffs' Section 1983 claims against the City.

### 3.3  The individual defendants are entitled to qualified immunity.

Defendants argue that the arresting officers—McKoon, Watkins, and Winner—are entitled to qualified immunity from Plaintiffs' Section 1983 claims. Qualified immunity is "an immunity from suit rather than a mere defense to liability." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.*

Courts apply a two-prong test to determine whether a police officer is entitled to qualified immunity: (1) whether the facts alleged show that the officer violated a constitutional right; and if so, (2) whether the right was clearly established at the time of the events at issue. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). District courts may address the two-step inquiry in either order. *Pearson,* 555 U.S. at 242.

Here, it makes the most sense to start with whether Officers McKoon, Winner, and Watkins violated Dontey's constitutional rights. On that score, Plaintiffs allege the officers violated Dontey's Fourth and Fourteenth Amendment rights by arresting him absent probable cause. "In the context of an unlawful arrest,

then, the two prongs of the qualified immunity analysis can be summarized as: (1) whether there was probable cause for the arrest; and (2) whether it is *reasonably arguable* that there was probable cause for arrest—that is, whether reasonable officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis in original).

### 3.3.1 Probable Cause.

Police officers have probable cause to make a warrantless arrest when the facts and circumstances within their knowledge are sufficient for a reasonably prudent person to believe that the suspect has committed a crime. *Id*. "The analysis involves both facts and law. The facts are those that were known to the officer at the time of the arrest. The law is the criminal statute to which those facts apply." *Id*. "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (internal citation omitted).

Officers McKoon, Winner, and Watson arrested Dontey for violating the terms of the Temporary Restraining Order issued against him.[2] Plaintiffs do not concede that Dontey violated the protective order, but they contend that even if he did, only threats of violence, stalking, or distance/location violations will give rise to

---

[2] Defendants also argue that Dontey's conduct amounted to cyberstalking, which the domestic violence protective order also prohibited. A person commits the crime of cyberstalking by making an electronic communication, "with intent to harass, intimidate, torment, or embarrass any other person," using "lewd, lascivious, indecent, or obscene words, images, or language or suggesting the commission of any lewd or lascivious act." RCW 9A.90.120(1) (2004).

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 11

criminal charges under Washington law governing restraining orders. Dkt. No. 25 at 12 (citing RCW 26.50.110).³ The Honorable John C. Coughenour considered the same argument in *Herron v. City of Bellingham,* and after surveying the relevant Washington law, held that the arresting officer's belief was reasonable that "a violation of *any* restraint provision is a crime under § 26.50.110(1)." No. C12-1933-JCC, 2013 WL 3778882, at *5 (W.D. Wash. July 18, 2013) (emphasis in original). This Court agrees. *See Fla. v. Harris*, 568 U.S. 237, 244 (2013) ("probable cause" requires the "kind of fair probability on which reasonable and prudent person, not legal technicians, act")(internal quotation marks omitted).

Assuming any violation of a domestic violence protective order is a crime under Washington law, the question for summary judgment is whether, in the light most favorable to Plaintiffs, a reasonably prudent person would believe that Dontey violated the domestic violence protective order issued against him. The facts of the case easily lend themselves to such a finding.

As an initial matter, Plaintiffs argue that there's a question of fact about which version of the protective order controlled since Dontey hadn't been served with the most recent version at the time of his arrest. While this is true, every version of the protective order—including the two versions that police had already served upon Dontey—precluded him from harassing or cyberstalking Rachel.

---

³ The parties cite different versions of RCW 26.50.110(1) in their briefs. Defendants cite the 2009 version, while Plaintiffs properly cite the 2019 version, which was in effect at when Dontey was arrested. Although they cite different versions of the statute, neither party identifies any meaningful differences between the operative language in either version.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 12

Moreover, under every version of the protective order, Rachel is to maintain "exclusive use" of the couple's home and use of their car.

The day before Dontey's arrest, Rachel called 911 to report that Dontey was at her home and trying to gain entry before taking her car. Officer McKoon responded to the call and interviewed Rachel and reviewed the 100+ text messages Dontey sent to her over the last two days. In her sworn statement to McKoon, Rachel described the messages as "manipulative," "threatening," and "slander[ous]," and that Dontey had continued to text her even after she asked him to stop. Rachel and a neighbor both reported that Dontey had taken the family car. Equipped with this knowledge, the officers arrested Dontey for violating the terms of the Temporary Restraining Order.

In her supporting declaration, Rachel attempts to recharacterize her victim statement to Officer McKoon in a more favorable light. The Court must consider, however, the information the officers had at the time of the arrest, not the later recollections of the parties. *See Rosenbaum*, 663 F.3d at 1076. Similarly, Plaintiffs argue that Officer McKoon's written report after the arrest is inconsistent or incomplete, but the "test for determining validity of arrest is whether the officer had actual probable cause to arrest, not whether officer articulated the correct basis for the arrest." *Coonts v. Potts*, 316 F.3d 745, 752 (8th Cir. 2003).

Finally, Plaintiffs' try to inject some doubt into the Court's analysis by arguing the Washington State Criminal Justice Training Commission Basic Law Enforcement Academy Domestic Violence Student Handbook states that "not all violations (of a court order) will trigger a mandatory arrest." The policy statements

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 13

found in this handbook are in no way binding on this issue, but Plaintiffs ignore language in the same section of the handbook that explains "an arrest may still be made as long as there is probable cause for the crime." Dkt. No. 22-9 at 38.

Thus, Plaintiffs failed to demonstrate that there is a genuine question of material fact about whether McKoon, Winner, and Watkins acted with probable cause.

### 3.3.2    Reasonable belief of probable cause.

Even assuming the officers arrested Dontey without probable cause, "the officer[s] may still be immune from suit if it was objectively reasonable for [them] *to believe* that [they] had probable cause." *Rosenbaum*, 663 F.3d at 1078 (emphasis in original). "The linchpin of the qualified immunity analysis is the reasonableness of the officer's conduct in the particular case at hand." *Id.* In *Rosenbaum,* the Ninth Circuit framed the reasonableness question as "whether *all* reasonable officers would agree that there was *no* probable cause" under the then-existing circumstances. *Id.* (emphasis added); *see Wesby*, 583 U.S. at 63 ("[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'") (internal citation omitted).

Plaintiffs fail to show a question of fact about whether *all* reasonable officers would agree that there was no probable cause to arrest Dontey when (1) the Superior Court issued a domestic violence protective order prohibiting him from harassing and cyberstalking Rachel, (2) the protective order gave Rachel exclusive use of their marital home and the right to use their car, (3) Dontey sent Rachel over 100 text messages over two days that she called "abusive" and "manipulative," (4)

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 14

Rachel asked Dontey to stop texting her, but he continued, (5) Dontey visited their marital home and tried to gain entry, ultimately succeeding in taking the family car, and (6) Rachel prepared a handwritten, sworn statement complaining about Dontey's threatening conduct. Taking these facts, even in the light most reasonable to Plaintiffs, the Court finds that most, if not all, reasonably competent police officers would believe there's a fair probability that Dontey committed a crime by violating the terms of the domestic violence protective order.

Accordingly, the Court GRANTS Defendants' motion and finds that McKoon, Winner, and Watkins are entitled to qualified immunity from Plaintiffs Section 1983 claims.[4]

### 3.4     Plaintiffs' Section 1983 claim against Interim Chief Allen must be dismissed.

Plaintiffs allege Defendant Rich Allen, the interim Police Chief of the Olympia Police Department, violated Dontey's constitutional rights. Defendants contend, however, that Allen had nothing to do with Dontey's alleged injuries. The Court agrees.

Plaintiffs argue that Allen is "charged under the Cities Policy's with ensuring their implementation and accuracy to the relevant legal standards" and that there was a "failure to train the City's Officers." Dkt. No. 25 at 19-20. While inadequate training is a type of *Monell* claim that may give rise to municipal liability, it will not

---

[4] "[T]he doctrine of qualified immunity does not shield defendants from state law claims." *Johnson v. Bay Area Rapid Transit Dist.*, 724 F.3d 1159, 1171 (9th Cir. 2013). Thus, the Court analyzes Plaintiffs' state-law claims against the individual officers below in Sections 3.6, 3.7, and 3.8.

suffice to establish that Allen committed the injury complained of. Under Section 1983, Allen may be found liable only if he deprived Plaintiffs of a constitutional right through "an affirmative act, participat[ing] in another's affirmative act, or omit[ting] to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Preschooler II v. Clark Cnty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007).

Plaintiffs do not allege that Allen took an affirmative act or that he participated in the act of another—they argue instead that he failed to act. But nowhere do Plaintiffs allege specific failures by Allen nor do they offer supporting evidence about his conduct that would place him in the causal chain of Plaintiffs' alleged injuries. For example, Plaintiffs say nothing about whether—as *interim* chief—Allen held or exercised any discretion in matters of officer training or whether he had any role in the Department's training at all. *See Martin for C.M. v. Hermiston Sch. Dist. 8R,* 499 F. Supp. 3d 813, 839 (D. Or. 2020) ("Analyzing an individual defendant's participation in the constitutional violation requires the court to 'take a very individualized approach which accounts for the duties, discretion, and means of each defendant.'") (quoting *Leer v. Murphy*, 844 F.2d 628, 633-34 (9th Cir. 1988)).

Plaintiffs' complete failure of proof on the critical element of causation dooms their claim against Allen. *See Celotex Corp.*, 477 U.S. at 323. Accordingly, the Court

GRANTS Defendants' motion for summary judgment on Plaintiffs' Section 1983 claims against Allen.[5]

### 3.5 Loss of consortium.

Defendants move for summary judgment on Plaintiffs' claim for loss of consortium. Plaintiffs do not address this claim in their response to the motion. "Loss of consortium is not, in and of itself, a cause of action but rather an element of damages." *Long v. Dugan*, 788 P.2d 1, 2 (Wash. App. 1990). To the extent that Plaintiffs brought loss of consortium as a standalone claim, the Court GRANTS summary judgment to Defendants.

### 3.6 State law false imprisonment.

Defendants move for summary judgment on Plaintiffs false imprisonment claim, arguing correctly that probable cause is a complete defense. *See Jacques v. Sharp*, 922 P.2d 145, 147 (Wash. Ct. App. 1996) ("Probable cause is a complete defense to an action for false arrest [or] false imprisonment.").

Thus, having already found no triable issue of fact about whether the officers had probable cause to arrest Dontey, the Court GRANTS Defendant's motion for summary judgment and dismissed Plaintiffs' false imprisonment claim.

---

[5] Plaintiffs' Section 1983 claims against Defendant Bryan Houser are similarly flawed. Houser is an officer with the Olympia Police Department. At the time they filed their complaint, Plaintiffs believe that Houser took part in Dontey's arrest, but discovery has confirmed that House was not present at the time. Dkt. No. 25 at 9 n.2. Plaintiffs "do not object to Officer Houser being dismissed" from the case. *Id.* Accordingly, the Court GRANTS Defendants' motion to dismiss all claims against Houser.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 17

**3.7   Negligence claim.**

Plaintiffs' theory of negligence is difficult to track but seems to come down to their claim that "McKoon had a duty of care to Dontey to make the right decision about probable cause," which she breached. Dkt. No. 25 at 21. Whether this claim is framed as "negligent investigation," as Defendants insist, or something else, it comes down to whether there was a duty owed and breach. Generally, "law enforcement activities are not reachable in negligence." *Keates v. Vancouver*, 869 P.2d 88, 93 (Wash Ct. App. 1994). But even assuming McKoon owed Dontey a duty "to make the right decision" related to probable cause, it has not been breached because, as explained above, the Court finds that McKoon had probable cause to arrest Dontey. Accordingly, the Court GRANTS Defendants' motion for summary judgment on this claim.

**3.8   Intentional/reckless infliction of emotional distress.**

Plaintiffs allege that McKoon's conduct was outrageous because she knew that Dontey had not been served with the version of the temporary restraining order reinstating all restrictions, but she arrested him still on the pretense of service with the latest restraining order. Dkt. No. 25 at 21-22.

Under Washington law, the tort of outrage requires the proof of three elements: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Dicomes v. State*, 782 P.2d 1002, 1012 (Wash. 1989) (internal citations omitted). "The conduct in question must be *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded*

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 18

*as atrocious, and utterly intolerable in a civilized community.*" *Id.* (emphasis in original) (citations omitted). "[I]t is initially for the court to determine if reasonable minds could differ on whether the conduct was sufficiently extreme to result in liability." *Id.* at 1013 (citation omitted).  The standard for proving extreme and outrageous conduct is high. *See, e.g.*, *Riser v. Wash. State Univ.*, No. 2:18-CV-0119-TOR, 2018 WL 4955206, at *5 (E.D. Wash. Oct. 12, 2018) ("The presence of armed police officers arriving at 8 p.m. may be startling for some, but—at most—this is a mere annoyance and falls far short of the conduct that is actionable under the tort of outrage.").

The question is not a close one. McKoon carried out an arrest with probable cause. Making every inference in favor of Plaintiffs, the court concludes that reasonable minds would not disagree over whether this rises to the level of indecency, atrocity, and intolerability that this tort requires. The Court finds as a matter of law that Plaintiffs have not pointed to conduct so outrageous in character, and so extreme in degree, as to go beyond all possible bound of decency. Plaintiffs have also provided no evidence to support severe emotional damages.

The Court GRANTS summary judgment to Defendants on Plaintiffs' claim for outrage.

### 4. CONCLUSION

In sum, the Court GRANTS Defendants' motion for summary judgment on all claims.

Dated this 29th day of January, 2024.

　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　Jamal N. Whitehead
　　　　　　　　　　　　　　　　　　United States District Judge

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT - 20